**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

UNITED STATES OF AMERICA,

Plaintiff,

v.

NLI HOLDINGS, INC.,

Defendant.

Civil No. 1:26-cv-2382

**COMPLAINT**

The United States of America, by the authority of the Attorney General of the United States, acting on behalf of the Regional Administrator of the U.S. Environmental Protection Agency ("EPA"), Region 2, alleges as follows:

## NATURE OF THE ACTION

1. In this action, the United States seeks, under Section 107 of the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9607, from the defendant reimbursement of costs incurred by EPA for response actions at the "789 Upper Mountain Road Removal Site" in Lewiston, New York ("Site").

## JURISDICTION AND VENUE

2. This Court has jurisdiction over the subject matter of this action and over the defendant under 28 U.S.C. §§ 1331 and 1345 and Section 113(b) of CERCLA, 42 U.S.C. § 9613(b).

3. Venue is proper in this judicial district for the claim pursuant to 28 U.S.C. § 1391(b) and Section 113(b) of CERCLA, 42 U.S.C. § 9613(b), because the releases or threatened releases of hazardous substances that gave rise to this claim occurred in this district, and because the Site is located in this district.

## DEFENDANT

4. Defendant NLI Holdings, Inc. is a corporation organized under the laws of the State of Delaware, with a designated service address of 251 Little Falls Drive, Wilmington, Delaware 19808.

5. Defendant is a "person" within the meaning of Section 101(21) of CERCLA, 42 U.S.C. § 9601(21).

6. In 2026, NL Industries, Inc. was merged into NLI Holdings, Inc.

7. NLI Holdings, Inc. is the legal corporate successor of Titanium Alloy Manufacturing Co. and NL Industries, Inc.

## THE STATUTORY FRAMEWORK

8. CERCLA was enacted in 1980 to provide a comprehensive governmental mechanism for abating releases and threatened releases of hazardous substances and other pollutants and contaminants and for funding the costs of such abatement and related enforcement activities, which are known as "response actions." 42 U.S.C. §§ 9604(a), 9601(25).

9. Under Section 104(a)(1) of CERCLA, 42 U.S.C. § 9604(a)(1):

> Whenever (A) any hazardous substance is released or there is a substantial threat of such a release into the environment, or (B) there is a release or substantial threat of release into the environment of any pollutant or contaminant which may present an imminent and substantial danger to the public health or welfare, the President is authorized to act, consistent with the national contingency plan, to remove or arrange for the removal of, and provide for remedial action relating to such hazardous substance, pollutant, or contaminant at any time (including its removal from any contaminated natural resource), or take any other response measure consistent with the national contingency plan which the President deems necessary to protect the public health or welfare or the environment . . .

10. For CERCLA response actions and enforcement purposes, the Administrator of EPA is the President's delegate, as provided in operative Executive Orders, and, within certain limits, the Regional Administrators of EPA have been re-delegated this authority.

11. Under Sections 107(a)(2) and (3) of CERCLA, 42 U.S.C. §§ 9607(a)(2) and (3):

> (2) any person who at the time of disposal of any hazardous substance … operated any facility at which such hazardous substances were disposed of, [and] (3) any person … who by contract, agreement, or otherwise arranged for disposal … of hazardous substances owned or possessed by such person … at any facility … owned or operated by another party or entity and containing such hazardous substances … shall be liable for … all costs of removal or remedial action incurred by the United States Government … not inconsistent with the national contingency plan …

12. Under Section 113(g)(2) of CERCLA, 42 U.S.C. § 9613(g)(2), the court shall enter a declaratory judgment on liability for response costs that will be binding on any subsequent action or actions to recover further response costs.

## GENERAL ALLEGATIONS

13. The Site is located in Lewiston, Niagara County, New York.

14. The Site includes two residential properties with addresses of 783 and 789 Upper Mountain Road.

### Titanium Alloy Manufacturing Co. Operations

15. The allegations under Paragraphs 16 to 36 pertain to the period from 1938 to 1951, unless otherwise specified.

16. Beginning in 1906, Titanium Alloy Manufacturing Co. operated a manufacturing facility at 4511 Hyde Park Boulevard in Niagara Falls, New York. This facility was located approximately three miles from what is now the Site.

17. In 1948, NL Industries, Inc. purchased Titanium Alloy Manufacturing Co. and assumed direct operation of this facility.

18. Hereafter, Titanium Alloy Manufacturing Co. and NL Industries, Inc. are collectively referred to as “TAM.”

19. TAM's operations included the production of zirconium products, including zirconium metal, zirconium alloys, zirconium compounds and ground zirconium, and titanium products, including ferrotitanium and titanium pigments.

20. To make these products, TAM obtained heavy mineral sands from Florida and Australia.

21. Heavy mineral sands are raw beach sands and dune sands that have been processed to remove low-density minerals such as quartz, leaving a concentrate of heavy minerals.

22. TAM "beneficiated" the heavy mineral sands, *i.e.*, processed them to improve their quality and purity. The beneficiating process produced a feedstock used in the production of zirconium and titanium products.

23. TAM was the only company in Niagara and Erie Counties that beneficiated heavy mineral sands.

24. The beneficiating process involved separating the heavy mineral sands by physical means (for example, gravity tables and magnetic and electrostatic separators) to isolate useful minerals such as ilmenite and rutile and zircon.

25. TAM beneficiated two types of feedstock, zirconium feedstock which had high concentrations of zircon and titanium feedstock which had had high concentrations of rutile and ilmenite.

26. Using chemical processes and its furnaces, TAM converted the zirconium feedstock into zirconium metal and products and the titanium feedstock into titanium metal and products.

27. TAM's patents specified that zirconium feedstock should have a desired minimum concentration of zirconium and that a low percentage of total impurities (including titanium, iron, and silica) was to be expected.

28. TAM's patents specified that titanium feedstock should have a desired minimum concentration of titanium-bearing minerals and that total impurities (including iron, silica, and aluminum) should be kept to a minimum.

29. The beneficiation process sometimes yielded processed sands that contained insufficient concentrations of the desired mineral (either zircon or combined ilmenite and rutile), or that contained too high concentrations of unwanted minerals such as monazite (a mineral containing thorium), or both. These processed sands, referred to as "off-spec" sands, would not have been useful feedstock.

30. Processed sands that contain zircon, ilmenite, and/or monazite are generally radioactive, as these minerals typically contain thorium and uranium.

31. TAM's furnaces were lined with refractory bricks.

32. Commencing in the 1940s, TAM manufactured for sale a product referred to as barium titanate ("BTO"). BTO is a man-made product that is used in the manufacture of capacitors and piezoelectric devices.

33. Between 1940 and 1951, TAM was the only manufacturer of BTO in the country.

34. TAM possessed metal placards made to be attached to the containers of products that it sold to customers.

35. TAM disposed of BTO on occasion. It disposed of at least 20 tons of BTO at its own facility. The BTO TAM disposed of may have contained high concentrations of impurities.

36. BTO, if it contains enough impurities, would be considered to be "off-spec." Off-spec BTO is of no use to and cannot be sold to manufacturers of capacitors and piezoelectric devices.

**The 789 Upper Mountain Road Removal Site**

37. In 2019, the owners of the two parcels comprising the Site hired an environmental consultant to conduct a gamma survey at their property, which identified radioactivity measurements at more than 30 times background readings.

38. The property owners notified the New York State Department of Health ("NYSDOH") of the radioactivity readings. In 2020, NYSDOH referred the Site to EPA for further investigation.

39. EPA performed a removal site evaluation in 2020 and determined that there was an unacceptable risk to the residents posed by gamma radiation, radon inhalation, and radioactive dust particles originating from the materials buried at the Site.

40. The majority of the materials buried at the Site were radioactive sands.

41. The radioactive sands found at the site are a hazardous substance, within the meaning of Section 101(14) of CERCLA, 42 U.S.C. § 9601(14).

42. EPA installed a radon mitigation system at 789 Upper Mountain Road in January 2021.

43. EPA commenced excavation activities at both parcels to remove and dispose of the radioactive sands and other fill material.

44. The radioactive material at the Site was found in what appears to be a former quarry that spanned the two residential properties, including underneath both homes.

45. Based on aerial imagery, the pit was filled in with the waste material sometime between 1938 and 1951.

46. The material excavated from the Site comprised radioactive gray, black, and maroon-colored sands and a white, chalky substance, later determined to be BTO. The sands were distributed in layers and these layers were separated by layers of BTO. This pattern of disposal was consistent from the bottom to the top of the waste mass.

47. The excavated material also included some furnace refractory bricks and eight metal placards bearing the inscription "Titanium Alloy Manufacturing Co. Niagara Falls."

48. The placards were found in a portion of the pit under the home at 783 Upper Mountain Road, surrounded by the sands. The placards had blanks to be filled in to identify the product in the container to which they would have been attached. None of the blanks on any of the placards had been filled in.

49. From the waste mass, EPA's field team collected nine samples of the sands and one sample of the BTO. These samples were sent to a laboratory for material identification and analysis of the mineralogical composition (*i.e.*, fingerprinting analysis).

50. None of the sand samples that were analyzed would have satisfied TAM's specifications for useful titanium feedstock; they contained less than the minimum amount of ilmenite and rutile indicated in TAM's patents.

51. Eight of the nine sand samples would not have satisfied TAM's specifications for useful zirconium feedstock; they contained less than the minimum amount of zircon indicated in TAM's patents.

52. All nine sand samples contained concentrations of impurities such as titanium oxides, chromite, and monazite that were significantly higher than the amounts expected in feedstock as indicated in TAM's patents.

53. None of the sands found at the Site were, prior to disposal, useful in the production of titanium or zirconium products.

54. The sand samples had a mineral content consistent with heavy metal sands imported from Australia.

55. The BTO sample contained quantities of titanium impurities.

56. The presence of titanium impurities indicated that the BTO was off-spec and that it would not have been a useful product.

57. EPA demobilized from the Site on September 28, 2023, and issued a final pollution report on October 26, 2023.

58. In total, EPA excavated approximately 10,000 tons of contaminated material from the Site.

**CLAIM FOR RELIEF – RECOVERY OF PAST COSTS**

59. Paragraphs 1 to 58 are realleged and incorporated herein by reference.

60. The Site is a "facility" within the meaning of Section 101(9) of CERCLA, 42 U.S.C. § 9601(9).

61. There have been releases, within the meaning of Section 101(22) of CERCLA, 42 U.S.C. § 9601(22), and threatened releases, of hazardous substances, within the meaning of Section 101(14) of CERCLA, 42 U.S.C. §§ 9601(14), at or from the Site.

62. The United States has incurred costs of response, within the meaning of Section 101(25) of CERCLA, 42 U.S.C. § 9601(25), to respond to the releases or threatened releases of hazardous substances at the Site.

63. The United States' response actions at the Site are not inconsistent with the National Contingency Plan, 40 C.F.R. Part 300.

64. The defendant either (a) arranged for the disposal of hazardous substances that it owned at a facility owned or operated by another party or (b) operated a facility at a time that hazardous substances were disposed of there, and, therefore it is within one of the classes of liable persons described in Section 107(a) of CERCLA, 42 U.S.C. § 9607(a), with respect to the Site.

65. Pursuant to Section 107(a) of CERCLA, 42 U.S.C. § 9607(a), the defendant is jointly and severally liable to the United States for response costs regarding the Site.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff the United States respectfully requests that this Court: (i) enter judgment in favor of the United States under Section 107(a) of CERCLA, 42 U.S.C. § 9607(a), holding defendant jointly and severally liable for all response costs regarding the Site, including interest; (ii) enter a declaratory judgment that will be binding in any subsequent action for further response costs, pursuant to Section 113(g)(2) of CERCLA, 42 U.S.C. § 9613(g)(2); (iii) award the United States its costs of this action; and (iv) grant such other and further relief as the Court deems appropriate.

Respectfully submitted,

**FOR THE UNITED STATES**:

ADAM R.F. GUSTAFSON
Principal Deputy Assistant Attorney General
U.S. Department of Justice
Energy and Natural Resources Division

KENNETH A. KLUKOWSKI
Senior Counsel
U.S. Department of Justice
Energy and Natural Resources Division

By: /s/ Mark *Gallagher*
Mark A. Gallagher
U.S. Department of Justice
Energy and Natural Resources Division
Environmental Enforcement Section
Washington, DC 20044-7611
(202) 532-3321
mark.gallagher@usdoj.gov

MICHAEL DiGIACOMO
United States Attorney
Western District of New York

David Coriell
Assistant United States Attorney
Office of the United States Attorney
Western District of New York
138 Delaware Avenue
Buffalo, New York 14202
(716) 843-5700
david.coriell@usdoj.gov

OF COUNSEL:

Margo Ludmer
Assistant Regional Counsel
Office of Regional Counsel
U.S. Environmental Protection Agency, Region 2
290 Broadway
New York, New York 10007